# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA, )
)
                        Plaintiff, )       Case No.   2:06-cr-00143-JCM-GWF
)
vs. )       **FINDINGS & RECOMMENDATIONS**
)
JOSEPH PAUL NEWMAN, )       **(Defendant's Motion to Suppress**
)       **Evidence for Fourth Amendment**
                    Defendant. )       **Violation - #18)**
_____ )

      This matter is before the Court on Defendant Joseph Paul Newman's Motion to Suppress

Evidence for Fourth Amendment Violation and Request for Evidentiary Hearing (#18), filed April 5,

2007 and the Government's Response In Opposition to Defendant's Motion to Suppress Evidence (#31),

filed June 12, 2007.  The Court conducted an evidentiary hearing in this matter on June 25, 2007.  The

Court granted leave to file supplemental briefs following the hearing.  Defendant filed his Supplemental

Brief (#34) on June 29, 2007 and a sealed Addendum to Supplemental Brief (#37) on July 5, 2007.  The

Government filed its Response to Defendant's Supplemental Brief (#41), on July 10, 2007 and a sealed

Response to Defendant's (Sealed) Addendum to Supplemental Brief (#42) filed July 10, 2007.

      Defendant Newman is charged in a two count Indictment (#1) filed on May 3, 2006 with being a

felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2).  The Indictment

alleges that Defendant Newman, a previously convicted felon, knowingly possessed firearms on two

separate dates: November 17, 2005 and December 8, 2005.  On both dates Defendant Newman was

detained and frisked by Las Vegas Metropolitan Police Department officers during which firearms were

1  allegedly found on his person.  Defendant contends that the police officers violated his Fourth

2  Amendment rights to be free from unreasonable searches and seizures in both incidents and seeks to

3  suppress the evidence of the firearms discovered by the officers as well as the statements made by the

4  Defendant.

5  **FACTS**

6       **1.**        **November 17, 2005 Search:**

7     On November 16, 2005 at approximately 11:30 p.m. Las Vegas Metropolitan Police Department

8  ("Metro" or "LVMPD") Officer N. Roberts made an Application for Telephone Search Warrant pursuant

9  to NRS 179.045 to Nevada District Court Judge Kathy Hardcastle.  *See Motion to Suppress (#18),*

10  *Exhibit "B"*.  Officer Roberts' recorded telephone application stated that on October 5, 2005 officers

11  received information from a confidential informant that a subject known as "Cat Daddy" was selling

12  large amounts of cocaine out of his residence.  The confidential informant also stated that a 9mm

13  handgun had been seen on the bed of the master bedroom and that "Cat Daddy" is known to have guns

14  and provides guns to his associates for protection.  *Id., page 2.*  The application stated the confidential

15  informant had previously done approximately three "C.I. buys for the police over the past eight months

16  and also has provided information which has resulted in numerous felony arrests and the recovery of

17  drugs and firearms."  *Id.*

18       According to the application, on October 5, 2005 the confidential informant drove officers by the

19  residence that "Cat Daddy" was "dealing out of" and pointed out the residence at 5087 Andover Drive.

20  The confidential informant also provided officers with a cellular telephone number for "Cat Daddy."

21  The officers obtained an administrative subpoena for this telephone number which showed that it

22  belonged to Chester Gandy.  An officer located a photograph of Chester Gandy from Metro records and

23  showed the photograph to the confidential informant who identified Chester Gandy as "Cat Daddy."  *Id.,*

24  *page 2*.  According to Officer Roberts, Chester Gandy had "priors" for attempted murder and felon in

25  possession of a firearm and had numerous priors from California for possession of controlled substances,

26  cocaine for sale and other narcotic related offenses.  *Id.*

27       The application further stated that on October 6, 2005, officers attempted to have the confidential

28  informant make a purchase of cocaine at 5087 Andover Drive.  The officers set up surveillance and sent

2

1   the confidential informant to the residence.  The confidential informant reportedly made contact with

2   Gandy in the residence.  The confidential informant reported that Gandy stated that there were cops all

3   over the area and that he would not sell cocaine to the confidential informant because it was "hot" and

4   Gandy wanted to wait until "it cooled off" before he started selling again.  *Id., pages 2-3.*

5          Officer Roberts' application stated that on November 16, 2005 officers made contact with a

6   different confidential informant who had previously provided information to the police.  This

7   confidential informant told the officers that "Cat Daddy" was selling large amounts of cocaine and that

8   the informant had bought cocaine from "Cat Daddy" the day before and had seen two firearms in the

9   residence.  This confidential informant also stated that "'Cat Daddy' is the person to see if you need a

10  gun." *Id., page 3.*  The confidential informant agreed to attempt to make a controlled buy of narcotics

11  from "Cat Daddy" and also pointed out 5087 Andover Drive as the residence from which "Cat Daddy"

12  deals drugs.  At approximately 7:30 p.m. on November 16, 2005, the officers provided the confidential

13  informant with $20.00 to make a purchase at the residence while under surveillance by police officers.

14  The confidential informant knocked on the door of the residence, and a black male answered the door.

15  The confidential informant did not enter the residence and reported back to the officers that the black

16  male who answered the door told "Cat Daddy" who was at the door.  The confidential informant heard

17  "Cat Daddy" say shut the door and lock it.  The confidential informant also reported that he smelled

18  marijuana coming from the residence.

19         At approximately 8:30 p.m. on November 16, 2005 the officers observed a vehicle occupied by a

20  black male and black female arrive at the residence.  The officers observed the black female enter and

21  then exit the residence two minutes later and reenter the motor vehicle.   Officers then followed the

22  vehicle and had a marked patrol unit stop it for a traffic violation.   Based on their suspicion that the

23  female had purchased controlled substances at the residence, the officers made contact with the female

24  passenger who was identified as Carleila Thomas.  According to the application, Ms. Thomas had priors

25  for drug and "imposture" related offenses.  The officers questioned Ms. Thomas who stated that she had

26  just purchased cocaine from "Cat Daddy" for $10.00 at the Andover residence and the officers retrieved

27  from her a plastic bag containing a substance that tested positive for .3 grams of cocaine.  *Id., page 3.*

28  . . .

3

1    The application for search warrant requested permission to make a nighttime search due to the

2    danger of evidence being destroyed and because officers had observed numerous persons and vehicles

3    approach the residence and conduct what appeared to be drug transactions at nighttime.  Officer Roberts

4    also requested permission for a nighttime search for officer safety because Chester Gandy was known to

5    carry firearms on his person,  had firearms readily available in the residence, and had prior arrests for

6    attempted murder, ex-felon carrying a concealed weapon, and numerous arrests for possession of

7    controlled substances for sale.   Officer Roberts also informed the Judge that the warrant would be

8    served by the Metro SWAT Unit, who for officer safety and the protection of citizens and children who

9    live in the area, conduct most of their executions of search warrants at nighttime.  *Id. pages 4-5*.  Based

10   on the information provided in Officer Roberts' sworn application, Judge Hardcastle found that there

11   was probable cause to issue a search warrant for the premises at 5087 Andover Drive and also authorized

12   the nighttime execution of the search warrant.  *Id., page 5.*

13    The search warrant was executed by Metro SWAT officers and detectives on November 17, 2005

14   at approximately 2:30 a.m.  Upon entering the residence, the SWAT Unit officers encountered

15   Defendant Joseph Paul Newman who was placed in handcuffs, removed from the residence and then

16   frisked.  The pat-down frisk revealed the presence of a firearm in Defendant's left-front pocket.  The

17   officer retrieved a handgun from Defendant's pocket which was identified as a "Phoenix Arms 22 long

18   rifle, model HP22AA, serial #4252690."

19    At the evidentiary hearing, the Government called Metro Detective David Denton who was the

20   officer primarily in charge of the investigation of Chester Gandy that resulted in the issuance of the

21   search warrant.  Detective Denton testified that in October-November 2005 he was assigned to Metro's

22   "problem solving Unit" which assists other Metro officers and detectives in conducting criminal

23   investigations.  Detective Denton testified that he had previously worked as a patrol officer in the

24   Boulder Highway-Tropicana area, where 5087 Andover Drive is located and which he described as an

25   area with a high level of criminal narcotics activity.  Detective Denton testified that the police had made

26   numerous arrests for narcotics and firearms offenses in the Boulder Highway-Tropicana area and for

27   shootings in the "Sportsmans Complex" which is located adjacent to 5087 Andover Drive.

28   . . .

4

1   Detective Denton testified that in October 2005, he became involved in the investigation of "Cat
2   Daddy", i.e., Chester Gandy.  He indicated that Metro was aware through "word on the street" that  "Cat
3   Daddy" was a narcotics trafficker.  Detective Denton testified that a confidential informant whom he was
4   working with told him that "Cat Daddy" deals a lot of cocaine and also deals in firearms and that "Cat
5   Daddy" is known as the person to go to get firearms.  Detective Denton testified that he worked with this
6   confidential informant in the past and the informant had made approximately three buys which led to
7   felony arrests and recovery of evidence.  The informant told the officers that he had purchased narcotics
8   at a residence located in the area of Boulder Highway and Tropicana.  Detective Denton drove the
9   informant to the area and he pointed out 5087 Andover Drive as the residence where he had bought
10  narcotics from "Cat Daddy".  Detective Denton also testified that this confidential informant had
11  reportedly dealt with "Cat Daddy" for the past year and had always known him to possess guns and to
12  provide them to his associates to protect his drug business.  Denton also described the confidential
13  informant's unsuccessful attempt to make a drug purchase from "Cat Daddy" in October 2005 as
14  described in the application for search warrant.

15  On cross-examination, Detective Denton testified that the first confidential informant, who
16  provided information about Chester Gandy on October 5, 2006, had numerous prior arrests for narcotics
17  offenses and was very knowledgeable regarding narcotics.  Detective Denton stated that he believed the
18  informant probably had a prior felony conviction, but he was not sure.  Detective Denton testified that
19  this informant occasionally called officers and provided information.  Detective Denton testified that the
20  second informant had no felony or misdemeanor convictions, but had prior arrests.  The second
21  informant had also previously worked with the police in other cases.  Detective Denton acknowledged
22  that information about the informants' prior criminal history was not included in the application for the
23  search warrant.

24  Detective Denton also testified about the surveillance conducted at 5087 Andover Drive on
25  November 16, 2005 during which he observed the black female arrive at the residence, go in and come
26  out a short time later.  Detective Denton testified that based on his training and experience as well as the
27  other information that the officers had obtained in their investigation, the black female's conduct was
28  very consistent with that of a person making a narcotics purchase at the residence.  Detective Denton

1   also described the subsequent traffic stop of the vehicle occupied by the black female and the

2   information that the officers obtained from her.  Detective Denton testified that in addition to stating that

3   she had just purchased cocaine at the 5087 Andover Drive residence and providing the officers with the

4   cocaine she had purchased, the black female informed the officers that she had also purchased cocaine at

5   the residence earlier that day.

6          Detective Denton also testified that the search warrant issued by Judge Hardcastle specifically

7   authorized the search of adult persons located on the premises at the time of execution of the search

8   warrant.  He testified that authorization for the nighttime execution of the warrant was requested, in part,

9   to preserve the gathering of evidence since most of the officer's surveillance information was gathered

10  during the nighttime.  He testified that more importantly the nighttime execution provision was sought

11  for officer safety and the safety of persons in the area.  He testified that there is a lot of outside foot

12  traffic, including children in the area during the daytime.  Detective Denton characterized the search

13  warrant as a "high risk search warrant" due to information regarding Chester Gandy's violent criminal

14  history and possession of firearms.  Pursuant to Metro policy, the search warrant was served by the

15  Metro SWAT Unit.  Detective Denton testified that approximately 13 SWAT officers were involved in

16  the execution of the entry.  He remained outside the residence during the entry and did not observe the

17  SWAT Unit enter the residence. Detective Denton testified that the SWAT Unit discovered three adult

18  males, two adult females and two children in the residence.

19         One of the SWAT officers, Kevin Warren, informed Detective Denton that a firearm had been

20  found in the left front pants' pocket of one of the males in the residence who was identified as Defendant

21  Newman.  Detective Denton testified that he then made contact with Defendant Newman and informed

22  him of his *Miranda* rights.  Defendant Newman agreed to waive his rights and speak with the officer.

23  According Detective Denton, Defendant Newman stated that he had obtained the firearm from a friend a

24  week earlier.  Defendant Newman also stated that he was a convicted felon and knew he was not

25  supposed to possess a firearm.  Detective Denton testified that he confirmed that Defendant Newman

26  was a convicted felon and placed him under arrest for a felon in possession of a firearm.

27         On cross-examination, Detective Denton acknowledged that the police did not have any

28  information or knowledge about Defendant Newman in regard to the subject investigation prior to the

                                                 6

1   execution of the search warrant.  Detective Denton also testified that the officers did not know who

2   Defendant Newman was until he was encountered in the residence at the time of the search.

3        The Government called Officer Kevin Warren who testified regarding the execution of the search

4   warrant by the Metro SWAT Unit.  Officer Warren testified that the subject search warrant was executed

5   by the SWAT Unit because it was classified as a "high risk" or "class three" search warrant.  Under

6   Metro's procedures or guidelines a "class three" or high risk search warrant includes search warrants that

7   involve suspects who have a history of violence and/or the likelihood of violence exists, suspects who

8   are known to be armed and highly dangerous or there is a probability that the suspects have access to

9   weapons.  Under Metro's guidelines, class three warrants may only be served by the SWAT Unit.

10   Officer Warren testified that the SWAT Unit obtains information about the nature of the search from the

11   investigating officers and the search warrant itself.  He believed the search warrant in the instant case

12   was classified as class three/high risk search warrant because some of the suspects were known to be

13   armed and carrying weapons on their person, and it was believed there were weapons in the house.   He

14   also indicated that the SWAT Unit was provided with information regarding Chester Gandy's criminal

15   history.

16        Officer Warren testified that prior to executing a warrant, the SWAT Unit conducts a

17   reconnaissance of the residence to assess whether it is fortified.  The reconnaissance officers then brief

18   the other members of the search team.  The SWAT team executes the search warrant pursuant to a

19   tactical plan that provides each member of the team with his assigned role.   In this case, Officer Warren

20   stated that the SWAT team consisted of an officer with a "Shock Lock," an officer with a ram who rams

21   the door to gain entry, twelve entry officers who enter and secure the premises and persons found

22   therein, and six additional containment officers deployed outside the residence to secure it on all sides –

23   for a total of twenty SWAT Unit officers.  The officers were all dressed in military style fatigues and

24   were armed.  Some of the officers were armed with submachines and one officer was armed with an M-

25   16.  The officers' weapons were drawn or displayed when they entered the residence.

26        Officer Warren testified that two announcements of the search warrant were given and then the

27   front door was rammed and the officers entered the residence.  The officers also deployed "distract"

28   devices which emit a high decibel boom and a high flash to disorient the persons in the residence.

7

1   Officer Warren testified that the front door opened into a living room area.  Upon entering the house,

2   Officer Warren came in contact with Defendant Newman in the living room.  The other entry officers

3   were also present in the living room at that point.  Officer Warren testified that he had the Defendant

4   place his hands on top of his head and placed plastic handcuffs on the Defendant and immediately

5   escorted him outside.  He described this as standard procedure in the execution of a high risk search.

6   Officer Warren testified that he took Defendant Newman "to a safe location away from where the

7   residence was and at that time conducted a pat-down." *Reporter's Transcript of Evidentiary Hearing,*

8   *June 25, 2007 (hereinafter "Transcript"),* page 52, lines 21-22.  Officer Warren explained why he

9   handcuffed Defendant, took him outside and performed a pat-down as follows:

10
11              Well, when we serve a search warrant, we want to make sure that the
              house is sterile for the detectives to come into.  So we – we do the search
              warrant and then we do a recheck where we go through and we recheck
12              everything inside the house, under beds, in the attic.

13              We also do a check – or a pat-down of all the suspects to make
              sure that none of 'em are armed or have any weapons upon their person.
              Because when we – when we're done doin' the search warrant and we give
14              it to the detectives, we want everything to be sterile and clear.

15   *Transcript, pages 52-53.*

16              Officer Warren further testified that the SWAT team does a pat-down on every subject

17   encountered during the execution of the search warrant to ensure officer safety.  *Id., page 55.*  A pat-

18   down is performed on each subject to ensure that he or she is not armed before they are turned over to

19   the detectives conducting the search of the premises.  *Id., page 72.*  Officer Warren testified that when he

20   took Defendant Newman outside, he did not know who he was, including whether he was Chester

21   Gandy, the target of the investigation.  *Id., page 53.*   He also acknowledged that there were no particular

22   circumstances regarding Defendant Newman which caused him to view him as dangerous.  *Id., page 68.*

23   Officer Warren testified that when he patted-down the Defendant, he recovered a small caliber firearm

24   from his left front pocket.  After finding the handgun, Officer Warren turned to where the detectives

25   were and notified one of them to come over.  Officer Warren then turned Defendant Newman and the

26   handgun over to the detective and advised him where he found the gun.

27          **2.    December 8, 2005 Search:**

28          Defendant Newman was released from custody following his arrest on November 17, 2005.  He

8

1  was thereafter involved in a second encounter with police on December 8, 2005 during which a handgun

2  was allegedly discovered on his person.

3        The Government called Metro Police Sergeant Oscar G. Chavez in regard to the incident on

4  December 8, 2005.  Sergeant Chavez testified that he has been employed by Metro as a police officer for

5  eighteen years.  He has been a sergeant for the past three years.  He is currently assigned to traffic detail.

6  Sergeant Chavez testified that in December, 2005 he was assigned to the patrol division and was part of

7  a Unit known as the "Crime Saturation Team."  Sergeant Chavez testified that the "Crime Saturation

8  Unit" was formed in October 2005, and its purpose was to saturate an area that was high in crime and

9  enforce all applicable laws with zero tolerance.  *Transcript, page 76.*  By zero tolerance, he explained

10  that if a person was stopped for jaywalking, he or she would be issued a citation or arrested, rather than

11  just issued a warning.  *Id.*  Officer Chavez testified that the "Crime Saturation Unit" initially focused on

12  an area known as "Nora 2" which is located between Sahara Avenue and Flamingo Road, on the north

13  and south, and Maryland Parkway and Paradise Road, on the east and west.  Sergeant Chavez testified

14  that analysis of crime statistics showed this area had the highest crime rate in the city and was infested

15  with homicides, narcotics, prostitution, stolen vehicles, and burglaries.  *Id., pages 77-79.*

16        Sergeant Chavez testified that on December 8, 2005 the  "Crime Saturation Unit" had been

17  patrolling in the "Nora 2" sector for just over a month and a half.  At 1:00 a.m. on that date, he was

18  operating as a uniformed single-man unit in a marked LVMPD patrol car and was patrolling in the area

19  of Palos Verdes and south of Twain.  *Id., pages 78, 81.*  Officer Chavez testified that he was driving very

20  slowly on southbound Palos Verde to make sure that he did not overlook something.  As he drove down

21  the street, something caught his attention to his left, just north of Calcaterra which is a cul-de-sac street

22  to the west of Palos Verde.  As he looked to his left, Sergeant Chavez saw a black male wearing a

23  sweater and dark clothing, with a white plastic bag in his hand, jump a seven foot rear wall of the

24  "Hampton Court Apartments."[1]  *Id., pages 81, 83.*  He testified that the man, who was subsequently

25  _____

26        [1]On cross-examination, defense counsel had Sergeant Chavez review a map and aerial
27  photograph of the area.  Based on that review, Sergeant Chavez acknowledged that the Hampton Court
   Apartments are located further east of the location where he observed Defendant jump the wall.
28  Apparently, unidentified apartments or residential units are located near the wall that he observed

1   identified as Defendant Newman, landed in the backyard of a residence that was separated from the alley

2   by a low wall.  Sergeant Chavez testified that he immediately made a left turn into an alleyway that was

3   adjacent to the apartment complex and the residence.  He testified that he exited his patrol car, activated

4   his spotlight and contacted the Defendant.  *Id.*

5          Sergeant Chavez testified that based on his month and a half experience of working in the area,

6   he believed the alleyway was a major corridor of narcotics trafficking and escape route for people fleeing

7   from the police.  He testified that his offices had encountered three or four people possessing narcotics

8   and fleeing from police within this little sector.  *Id., page 82.*  Sergeant Chavez testified that he was not

9   sure, given the hour and the fact that the Defendant was holding a grocery type bag, whether he was just

10  taking a shortcut or had just committed a crime.  *Id., page 84.*  Sergeant Chavez testified that he

11  instructed the Defendant to approach him, by asking him to walk up to the front of the vehicle and to

12  place his hands behind his back.  Sergeant Chavez testified that the Defendant reluctantly complied with

13  his instructions.

14         Sergeant Chavez testified that as the Defendant reached him and put his hands behind his back,

15  "I reached with my left hand and grabbed his fingers as – as is common for us to do and I was just gonna

16  pat the subject down for weapons."  *Id., pages 84-85.*  Sergeant Chavez testified that Defendant reached

17  back with his hands and clasped the officer's hands at the same time.  Sergeant Chavez stated that he

18  therefore broke contact with the Defendant and pushed him away.  Sergeant Chavez withdrew his Tazer

19  gun and asked the Defendant why he was grabbing his hands.  Defendant denied grabbing his hands.

20  Sergeant Chavez testified that this was the first occasion in his 18 years as a police officer that a suspect

21  or person acted in that manner and it scared and startled him.  *Id., page 85.*  Sergeant Chavez testified

22  that he told the Defendant that if he attempted anything further, the officer would discharge the Tazer

23  and he would receive 50,000 volts.  He asked Defendant to lay face down on the front of the vehicle.

24  Defendant reluctantly complied with his instructions.  As he walked behind Defendant, Sergeant Chavez

25  radioed for backup support.  Defendant placed his hands behind his back and Sergeant Chavez placed

26  him in handcuffs.  *Id., page 85.*

27  _____

28  Defendant jump over.

1    Sergeant Chavez testified that he then proceeded to pat down the Defendant beginning with the

2    front of his pants to see if he had a weapon.  Sergeant Chavez testified that Defendant would not allow

3    the officer to move him away from the vehicle to pat down the front of his pants.  Sergeant Chavez

4    testified that he was finally able to move the Defendant away from the vehicle and pat the front of his

5    pants at which time the officer immediately felt something hard that felt like a handgun to the left side of

6    Defendant's waistband.  Sergeant Chavez retrieved a loaded Stoeger .380 Llama handgun from

7    Defendant's waistband which was concealed beneath his sweater and untucked shirt.  *Id., page 87.*  After

8    backup officers arrived, Defendant's identity was obtained, and it was determined that he was a

9    convicted felon.  Defendant was thereupon placed under arrest for felon in possession of a firearm.

10    On cross-examination, Sergeant Chavez was shown the dictated report prepared by another

11    officer after the incident which he subsequently reviewed.  Sergeant Chavez acknowledged that the

12    written report did not mention that the Defendant was carrying a bag when Sergeant Chavez observed

13    him jump over the wall.  *Id., page 96.*  Nor did the report mention that the Defendant landed in the

14    backyard of a residence next to the wall and alleyway.

## DISCUSSION

16    The November 17, 2005 and December 8, 2005 seizures in this case both involved pat-down

17    searches performed by the officers to determine whether Defendant Newman had a weapon.  Under the

18    Fourth Amendment, law enforcement officers are authorized to briefly detain an individual and perform

19    a limited "pat-down" search of his person for the presence of weapons, where the officer has reasonable

20    suspicion that the person is engaged in or about to engage in criminal activity and may be armed, thereby

21    posing a danger to the safety of the officer.  *Terry v. Ohio*, 392 U.S.1, 88 S.Ct. 1868 (1968).  While

22    "reasonable suspicion" is a less demanding standard than probable cause and requires a showing

23    considerably less than preponderance of the evidence, the Fourth Amendment requires at least a

24    minimum level of objective justification for making the frisk.  *United States v. Sokolow*, 490 U.S. 1, 7,

25    109 S.Ct. 1581 (1989).  The officer must be able to articulate more than an "inchoate and

26    unparticularized suspicion or hunch of criminal activity."  *Illinois v. Wardlow*, 528 U.S. 119, 123, 124,

27    120 S.Ct. 673 (2000).  The totality of the circumstances test applies to investigatory stops made upon

28    reasonable suspicion.  *United States v. Arviso*, 534 U.S. 266, 273-274, 122 S.Ct. 744 (2002).  As *Arviso*

11

1   instructs, the particular objective facts on which an officer based his suspicions must be viewed in their

2   totality as to whether they contribute to a finding that reasonable suspicion existed.

3           **1.**     **November 17, 2005 Pat-Down Search:**

4         The evidence in this case shows that Defendant Newman was detained by Officer Warren very

5   soon after the SWAT officers entered the residence.  Officer Warren handcuffed Defendant Newman and

6   escorted him outside where he performed the pat-down search and discovered the handgun.  Defendant

7   Newman was then turned over to Detective Denton who determined that Defendant was a convicted

8   felon and placed him under arrest for possession of the firearm.  There is no evidence that the officers

9   discovered any narcotics or other contraband in the residence prior to Defendant's arrest.  Accordingly,

10   there was no probable cause to arrest Defendant Newman for possession of narcotics.  Nor does that

11   Government argue that such probable cause existed.  The admissibility of the evidence in this case,

12   therefore, depends on whether the officers had reasonable suspicion under *Terry* to perform a pat-down

13   search on Defendant Newman based on his presence in the residence at the time of the search.

14         In  *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587 (1981), the Court held that the police are

15   authorized under the Fourth Amendment to detain the occupants of a private residence during the

16   execution of a search warrant.  The Court held that the interest in preserving evidence and concerns for

17   officer safety in executing a search warrant of a private residence justifies the minimal intrusion on the

18   occupants' interest in being free from unreasonable seizures to support detention of the occupants during

19   the execution of the warrant.  In *Muehler v. Mena*, 544 U.S. 93, 125 S.Ct. 1465 (2005), the Court also

20   held that officers may handcuff occupants during the execution of a search warrant that involves a high

21   risk that occupants may be armed and pose a threat to the officers.  In *Muehler*, the police obtained a

22   warrant to search the house of a suspected gang member, who was allegedly involved in a drive-by

23   shooting, for deadly weapons and evidence of gang membership.  In light of the high risk involved in the

24   search, the police SWAT team was used to secure the residence and grounds before the search.  The

25   SWAT officers detained and handcuffed respondent and other occupants of the house and held them in

26   the garage while the search was conducted.  The respondent subsequently obtained a jury verdict against

27   the officers for violating her Fourth Amendment rights.  The jury verdict was upheld by the district court

28   and by the Ninth Circuit.

1    The Supreme Court reversed and held that the handcuffing and duration of the handcuffing did

2   not violate respondent's Fourth Amendment rights.  The Court stated that "[i]nherent in *Summers'*

3   authorization to detain an occupant of the place to be searched is the authority to use reasonable force to

4   effectuate the detention."  *Muehler,* 544 U.S. at 98-99.  The Court held that the officers' use of force in

5   handcuffing the respondent was reasonable because the governmental interests outweighed the marginal

6   intrusion.  In so holding, the Court stated:

> But this was no ordinary search. The governmental interests in not only
> detaining, but using handcuffs, are at their maximum when, as here, a
> warrant authorizes a search for weapons and a wanted gang member
> resides on the premises. In such inherently dangerous situations, the use of
> handcuffs minimizes the risk of harm to both officers and occupants. Cf.
> *Summers, supra,* at 702-703, 101 S.Ct. 2587 (recognizing the execution of
> a warrant to search for drugs "may give rise to sudden violence or frantic
> efforts to conceal or destroy evidence"). Though this safety risk inherent in
> executing a search warrant for weapons was sufficient to justify the use of
> handcuffs, the need to detain multiple occupants made the use of
> handcuffs all the more reasonable. Cf. *Maryland v. Wilson, supra,* at 414,
> 117 S.Ct. 882 (noting that "danger to an officer from a traffic stop is likely
> to be greater when there are passengers in addition to the driver in the
> stopped car").

15   *Muehler,* 544 U.S. at 100.

16    The Court also held that the duration of the handcuffing did not violate respondent's rights.

17   Justice Kennedy's concurring opinion noted, however, that in evaluating the reasonableness of the

18   duration of detention in handcuffs, the court must consider whether the handcuffs were properly applied

19   and whether the restraints should have been removed at some point during the search when doing so

20   would no longer compromise the officers's safety or the execution of the search warrant.  Justice

21   Stevens' concurring opinion, joined in by three other justices, also stated that the decision to use the

22   SWAT team to execute the entry and initially handcuff the occupants was reasonable.  The concurring

23   justices would have remanded the case, however, for a determination of whether the jury's verdict that

24   the duration of the handcuffing was unreasonable was supported by substantial evidence.

25    In this case, the police obtained a search warrant to search the 5087 Andover Drive residence for

26   illegal narcotics and weapons based on information that the resident, Chester Gandy, was selling

27   narcotics from the premises and that Gandy had "priors for attempted murder, felon in possession of a

28   firearm" and other drug-related offenses.  The warrant was also based on information provided by

13

1   confidential informants that firearms had been observed in the residence and that Gandy was known to

2   have guns and provide guns to his associates for protection.  *Motion to Suppress (#18), Exhibit "B".*

3   The search warrant also authorized the officers to conduct a nighttime search to preserve evidence and

4   for officer safety, and the application for the warrant informed the court that the search warrant would be

5   served by the Metro SWAT Unit.  *Id., pages 4-5.*  Detective Denton and Officer Warren testified that

6   based on the foregoing information the search in this case was considered a "high risk" or "class three"

7   search based on the belief or suspicion that the occupants of the premises would be armed.  The

8   information on which the search warrant was based is, therefore, comparable to the "high risk" search

9   described in *Muehler* which the Court held justified the officers in initially handcuffing the persons

10  found in the residence when the warrant is executed.

11          Officer Warren indicated that Defendant Newman was the first person that the officers

12  encountered when they made entry.  Officer Warren testified that he immediately detained Defendant

13  Newman, placed him in handcuffs and escorted him outside where he patted him down and discovered

14  the firearm on his person.  Officer Warren thereupon turned Defendant Newman over to Detective

15  Denton who determined that Defendant was a convicted felon and placed him under arrest for unlawful

16  possession of a firearm.  Based on Officer Warren's and Detective Denton's testimony, it appears that a

17  relatively short period of time passed between Defendant's initial detention, handcuffing, pat down and

18  arrest.  Therefore, the duration of Defendant's detention in handcuffs prior to his arrest is not an issue in

19  this case.

20          Nor does the Court find that Defendant Newman was under "de-facto" arrest prior to the

21  discovery of the handgun on his person.  In determining whether an investigative stop becomes an arrest,

22  the court must consider the totality of the circumstances, including the intrusiveness of the stop, the

23  aggressiveness of the police tactics, the restraint on defendant's liberty and the justification for the

24  tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of

25  the action taken.  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  As *Muehler* holds, in a

26  high risk search such as the one in this case, officers may detain and handcuff occupants of the residence

27  for purposes of officer safety and to effectuate the execution of the warrant.  Those actions do not

28  amount to an arrest.  A pat down of the person suspected of possessing weapons also does not, in itself,

14

1 rise to the level of an arrest.

2       Officer Warren testified that it is standard practice by the Metro SWAT Unit, when executing a

3 "high risk" search warrant, to pat down all subjects found in the residence.  He testified that he had no

4 knowledge of who Defendant Newman was when he detained him and patted him down.  He did not

5 observe Defendant make any furtive or threatening movements which caused him to particularly suspect

6 that Defendant was armed or posed a threat to officer safety.  Thus, the legality of the pat-down search of

7 the Defendant in this case depends on whether the nature of the search, itself, including information that

8 firearms might be located in the residence or that occupants might be armed, supports a finding of

9 reasonable suspicion to support the frisk.

10       *Muehler* did not address the issue whether or under what circumstances officers conducting a

11 "high risk" search may also pat down the occupants of the premises for the presence of weapons.

12 Defendant Newman relies on *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338 (1979), in arguing that the

13 officers did not have reasonable suspicion that Defendant Newman was armed or posed a danger to the

14 officers based on his mere presence in the residence.  In *Ybarra*, the police obtained a search warrant to

15 search a tavern based on information that a bartender was selling heroin which he kept in a drawer

16 behind the bar.  Seven or eight police officers executed the warrant.  Upon entering the tavern, the

17 officers advised the customers that they were going to conduct a cursory search for weapons.  One of the

18 officers proceeded to pat down each of the customers including the defendant.  During the initial frisk,

19 the officer felt an object in defendant's pocket which felt like a cigarette pack with objects in it.  The

20 officer did not remove the object at that point and instead proceeded to pat down the other customers.

21 The officer then frisked defendant again and retrieved a cigarette pack from defendant's pocket which

22 contained packets of heroin.

23       In holding that evidence should have been suppressed, the Supreme Court first held that at the

24 time the warrant was issued, there was no probable cause to believe that any persons on the premises,

25 other than the bartender, were engaging in criminal activity.  The application for the warrant did not

26 allege that the tavern was frequented by persons illegally purchasing drugs or that the informant had ever

27 seen a patron purchase drugs from the bartender.  The Court also held that probable cause to search

28 defendant was lacking at the time the officers executed the warrant.  The officers did not recognize

1   defendant and had no reason to believe he had committed, was committing or was about to commit any

2   crime.  The defendant did not behave in a suspicious or furtive manner.  The Court stated that "a

3   person's mere propinquity to others independently suspected of criminal activity does not, without more,

4   give rise to probable cause to search that person." *Ybarra,* 444 U.S. at 91, citing *Sibron v. New York*, 392

5   U.S. 40, 62-63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (police officer did not have probable cause

6   to believe that defendant was engaged in criminal activity based on his observation that defendant spoke

7   to several known narcotics addicts on the street and inside a restaurant.)  *Ybarra* also rejected the state's

8   argument that the officer's pat-down search of defendant was constitutionally permissible under *Terry v.*

9   *Ohio* based on reasonable suspicion that defendant was armed and presently dangerous.  The Court again

10   cited the fact that there was no evidence that the officers recognized defendant as a person with a

11   criminal history and had no particular reason, based on defendant's behavior, to believe that he might be

12   inclined to assault them.  *Ybarra*, 444 U.S. at 92-94.

13         Some federal circuit court decisions have distinguished *Ybarra* where the pat down of the

14   defendant occurred during the execution of a narcotics search warrant in a private residence and there

15   was some additional suspicious behavior by the defendant and other circumstances that warranted the

16   officers' concerns for their safety.  In *United States v. Harvey*, 897 F.2d 1300 (5th Cir. 1990), the police

17   obtained a warrant to search a residence for methamphetamine and weapons.  The warrant also provided

18   for the arrest of the person who was the subject of the investigation and any other persons making entry

19   into the location or making their escape.  During the execution of the search warrant, and after officers

20   had discovered drugs and firearms in the residence, defendant drove up in the alley next to the residence.

21   The officer detained the defendant, patted him down and discovered a handgun.  In holding that the pat

22   down did not violate the Fourth Amendment, the court rejected defendant's contention that the sole

23   justification for the stop and frisk was the officer's assertion that it is common for persons dealing in

24   narcotics to carry weapons. The court stated that there were many other factors that supported the frisk,

25   including that defendant remained silent when the officer asked him if he was armed, the officers had

26   already discovered methamphetamines and firearms on the premises, and the residence was well known

27   as a place where frequent drug deals were made and the officer could reasonably infer that defendant had

28   arrived at the residence to either buy or sell drugs.  *Harvey* distinguished *Ybarra* as follows:

> Unlike the instant case, *Ybarra* involved the wholesale search of all
> individuals present during the execution of a search warrant. In contrast,
> the instant case involved the search of one individual, Donny Joel Harvey,
> and, as *Ybarra* instructs, Officer Moore's suspicion was "directed at the
> person to be frisked [Harvey]." Moreover, the *Ybarra* case involved
> contraband, whereas, in the case at bar, the search yielded a loaded
> handgun-precisely the type of object for which the *Terry* exception was
> carved out by the Supreme Court. Thus, we are constrained to conclude
> that Harvey's reliance on *Ybarra* is misplaced.

The court made clear, however, that it was not countenancing the search of any person who happens to be on the premises where a narcotics warrant is being executed and that mere presence on such premises with nothing more does not suffice to justify a pat-down search under *Terry. Harvey,* 897 F.2d at 1304.

In *United States v. Reid*, 997 F.2d 1576 (D.C. Cir. 1993), the court held that the police officers were justified in detaining and frisking the defendant whom they encountered leaving a suspected "crack house" located in an upstairs apartment which the officers were about to enter to execute a search warrant for narcotics. The frisk resulted in the discovery of narcotics on defendant's person. In distinguishing *Ybarra*, the court held that "[c]ommon sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual who happens to be in a public tavern where the bartender is suspected of possessing drugs. Police officers are not blind to these realities and we should not encourage them to be." *Reid*, 997 F.2d at 1578-79. The court declined, however, to generally hold that the police should be able to search everyone on the premises for weapons when executing a narcotics search warrant. The court noted that while *People v. Thurman*, 209 Cal.App.3d 817, 257 Cal.Rptr. 517 (1989), seemed to support that view, defendant was not on or in the premises to be searched. The court stated that were it not for the specific testimony of the officer that he felt endangered by defendant's presence behind the police officers as they were seeking to execute the search warrant, the court would not have upheld the frisk.

Other circuit court decisions have upheld frisks of persons in or near the residential premises to be searched during the execution of a search warrant for narcotics where the circumstances supported a reasonable suspicion that the person might be armed and there were concerns for officer safety. *United States v. Proctor*, 148 F.3d 39 (1st Cir. 1998) (officer had reason to suspect that a person approaching the

17

1   house being searched for narcotics might be there to buy or sell narcotics and the lone officer had

2   reasonable concern for his safety); *United States v. Pace*, 898 F.2d 1218, 1238-39 (7th Cir. 1990) (police

3   were justified in detaining and patting down two persons they encountered in a residence that the officers

4   entered to execute a search warrant for evidence of illegal gambling); *Rivera v. United States*, 928 F.2d

5   592, 606 (2d Cir. 1991) ( stating that it was undoubtedly reasonable for agents to frisk the occupants of

6   an apartment during the execution of a search warrant of a suspected narcotics trafficking ring being

7   operated there.)  On the other hand, *Leveto v. Lapina*, 258 F.3d 156, 164-165 (3rd 2001), held that a pat-

8   down search of the subjects of the investigation during the execution of search warrants for tax-related

9   crimes violated the Fourth Amendment where the agents had no evidence that the persons were armed or

10  that weapons were located on the premises.

11      Several state court decisions have also upheld pat-down searches of occupants or persons in or

12  near a private residence that is the subject of a search warrant for narcotics and/or weapons.  *See*

13  *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (Md. 2003), citing  People *v. Thurman,* 209 Cal.App.3d

14  817, 823, 257 Cal.Rptr. 517, 520 (1989); *State v. Trine,* 236 Conn. 216, 673 A.2d 1098 (1996); *Condon*

15  *v. State,* 203 Ga.App. 163, 416 S.E.2d 802 (1992); *State v. Kester,* 137 Idaho 643, 51 P.3d 457 (2002);

16  *State v. Bitterman,* 304 Minn. 481, 485, 232 N.W.2d 91, 94 (1975); *State v. Dawson,* 295 Mont. 212,

17  983 P.2d 916 (1999); *State v. Taylor,* 82 Ohio App.3d 434, 612 N.E.2d 728 (1992); *Commonwealth v.*

18  *Patterson,* 405 Pa.Super. 17, 591 A.2d 1075 (1991); *State v. Curtis,* 964 S.W.2d 604

19  (Tenn.Crim.App.1997); *Murphy v. Commonwealth,* 37 Va.App. 556, 559 S.E.2d 890 (2002) reversed, in

20  part by *Murphy v. Commonwealth*, 570 S.E.2d 836 (Va. 2002), on grounds that the frisk exceeded the

21  scope allowed in *Terry*; *State v. Howard,* 7 Wash.App. 668, 502 P.2d 1043 (1972); and *State v. Guy,* 172

22  Wis.2d 86, 492 N.W.2d 311 (1992), *cert. denied* 509 U.S. 914, 113 S.Ct. 3020 (1993).

23      In *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (Md. 2003), the police obtained a search warrant

24  to search a residence for narcotics.  The application for the search warrant included information obtained

25  from several confidential informants and concerned citizens, and observations made by the police during

26  surveillance that the subject of the search, Bivens, was using the residence as a stash house in his drug

27  trafficking operations.  The application was supported by witness accounts and surveillance regarding

28  heavy vehicle and pedestrian traffic at the residence, with individuals only staying brief periods of time,

1  which were significant indicators of drug trafficking.  Confidential informants also reported that large

2  quantities of controlled substances were seen at the premises and on Bivens' person.  In addition, the

3  application stated that Bivens had previously been charged with drug-related and violent offenses and

4  had been involved in a high speed police chase.  An informant also reported seeing several guns in the

5  residence and that Bivens also had a gun on his person.  The police executed the warrant by making a

6  forced entry into the residence.  Although Bivens was not present, the officers located two adult females

7  and two children in the residence.  The officers handcuffed the occupants and had them lie down on the

8  ground while the officers searched the residence for other subjects.  After everyone was secured, the

9  officers performed a pat down on the occupants for weapons.

10       In holding that the frisk did not violate the Fourth Amendment, *Dashiell* held that the

11  information in the application for the search warrant provided reasonable suspicion that the occupants of

12  the residence might be armed and dangerous and therefore justified the officers in frisking the occupants

13  when they made entry.  In distinguishing *Ybarra*, the court stated:

14           The facts purporting to justify a weapons frisk based on peril to the
             officers in *Ybarra*, pale in comparison to those in the instant case. While
15           the Supreme Court stated that the police did not have "any particular
             reason to believe that [Ybarra] might be inclined to assault them," because
16           Ybarra was a random patron in a public business not acting in a suspicious
             manner, the officer who frisked petitioner in the case *sub judice* did have a
17           reasonable belief that petitioner could have been armed and dangerous
             based on several particularized facts contained in the application for the
18           search warrant. First, the Task Force had voluminous evidence of drug
             trafficking activities at Booth Street reasonably suggesting that the
19           numerous visitors to Booth Street, and thus its occupants at the time of the
             warrant's execution, were involved in the drug trade. Weapons and guns
20           are widely known to be used in narcotics trafficking and, in this case, the
             police had particularized knowledge that "several guns" were located
21           within the Booth Street premises.

22  *Dashiell,* 821 A.2d at 381-82.

23       The court also noted the potentially higher risk of danger that officers face in executing a search

24  in a private residence as opposed to a public place.  The court held that the totality of the facts suggested

25  that any occupant of the resident might present an imminent danger to the entering officers by using one

26  of the guns reported to be on the premises and the officers were therefore justified in frisking the

27  occupants.

28  . . .

19

1      In *Murphy v. Commonwealth,* 559 S.E.2d 890, 566 (Va.App. 2002), the officers executed a

2   search warrant of a residence for marijuana, cocaine, heroin, firearms and a named suspect.  Upon entry

3   to the residence, the officers found five persons present.  The defendant, who was seated on a couch was

4   ordered to lie on the floor and place his arms away from his body.  The officer then handcuffed the

5   defendant and performed a pat-down search for weapons.  No weapon was discovered, but the officer

6   found a plastic bag containing marijuana in defendant's pocket.   The court also held that a protective

7   frisk of occupants of a residence being searched pursuant to a warrant may be reasonably justified based

8   on information contained in the search warrant application.  In finding the frisk in that case was

9   reasonable, the court stated:

10              Here, significantly, the house was being searched because a magistrate
               determined that there was probable cause to believe the house was the site
11              of a narcotics trafficking operation and that firearms were present and
               issued a search warrant authorizing a search of the house and the seizure of
12              narcotics and firearms discovered.  (citation omitted.)  Murphy and four
               others were present in the house when the warrant was executed.  It was
13              reasonable to believe that he might have been involved in the narcotics
               operation and the officers knew from experience that those involved in
14              narcotics are often in possession of firearms.

15    *Murphy*, 559 S.E.2d at 566.

16      *Murphy* also distinguished *Ybarra* on the grounds that it involved a search in a public place

17   where there was less reason to suspect that persons, who were otherwise unknown to have any

18   connection to the criminal activity, would be armed or pose a danger to the officers.[2]

19      In *State v. Guy*, 492 N.W.2d 311 (Wis. 1992), *cert. denied* 509 U.S. 914, 113 S.Ct. 3020 (1993),

20   the Wisconsin Supreme Court arguably adopted an even broader rule permitting officers to frisk the

21   occupants of a house during the execution of a narcotics search warrant.  The court held that it would not

22   restrict the officers' right to frisk occupants of the residence based on whether the search involved a

23   major versus minor drug trafficking offense.  The application for a search warrant in that case apparently

24   did not include particularized information indicating that firearms were located in the residence.  The

25

26          [2]The Virginia Supreme Court, however, overruled the court of appeals' determination that the
   officers were justified in seizing the plastic bag from defendant under the "plain touch" rule, and
27   declined to address the issue whether the initial frisk was lawful under the Fourth Amendment.  *Murphy*
28   *v. Commonwealth*, 570 S.E.2d 836 (2002).

1 | court, however, accepted the testimony of the officers that in their experience in executing narcotics

2 | search warrants they frequently found firearms and encountered armed persons and that they feared for

3 | their safety in executing such warrants.  The court also relied on statements by the Supreme Court in

4 | several decisions, including *Maryland v. Buie*, 494 U.S. 325, 333, 110 S.Ct. 1093, 1098 (1990);

5 | *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481 (1983); *Pennsylvania v. Mimms*, 434 U.S.

6 | 106, 111, 98 S.Ct. 330, 333 (1971) and *Michigan v. Summers*, 452 U.S. 692, 702, 101 S.Ct. 2587 (1981),

7 | regarding the dangers faced by police officers in executing searches, particularly those involving

8 | narcotics offenses.

9 |     Based on the foregoing case law, the Court also concludes that *Ybarra* is distinguishable where

10 | the officers have reliable information that the residence to be searched is being used in a narcotics

11 | trafficking operation, that weapons are located on the premises and that the suspected trafficker is armed

12 | and potentially dangerous based on the nature of the alleged offense, his prior criminal history and that

13 | he has provided firearms to his associates or others.  Although *Muehler* did not address the validity of a

14 | pat-down search of the occupants, that decision is not inconsistent with the foregoing cases that have

15 | distinguished *Ybarra*.  A unanimous Court in *Muehler* held that it is reasonable to initially handcuff the

16 | occupants of a residence in executing a high risk search warrant because of the potential that the

17 | occupants may be armed and dangerous.  A majority of the Court also held that handcuffing for up to

18 | two or three hours while the search was conducted was reasonable.  Although a pat-down search is

19 | arguably more intrusive than handcuffing, common sense suggests that permitting the officers in such

20 | circumstances to perform a pat-down search of the occupants for the presence of weapons, which

21 | reasonably lessens the officers' concerns for safety if no weapons are discovered, and may provide a

22 | basis for releasing the person from handcuffs, is also reasonable.

23 |     **2.**    **Whether the Search Warrant Was Supported by Probable Cause; Defendant's Request for *Franks* Hearing:**

24 |

25 |     Defendant's Motion to Suppress did not argue that the search warrant, itself, was not supported

26 | by probable cause or request a *Franks* hearing based on intentional material omissions from the affidavit

27 | supporting the issuance of the warrant.  *Motion to Suppress (#18).*  It is evident from the application for

28 | the search warrant that the officers did not provide information to the issuing judge regarding the

1    informants' prior criminal history which may be relevant to their credibility or reliability and this issue

2    could therefore have been raised in the motion.[3]

3         During the evidentiary hearing, the Court permitted Defendant's counsel to question Detective

4    Denton about the criminal history of the two confidential informants.  He testified that he believed the

5    first informant had a prior felony conviction, but he was not sure.  He also testified that the informant

6    had numerous prior arrests for narcotics-related offenses and "had a very knowledgeable working of

7    narcotics."  *Transcript, page 30.*  As set forth in the application for search warrant, Officer Roberts

8    informed the issuing judge that this informant had previously done approximately three "C.I. buys" for

9    the police over the preceding eight months and had provided information that resulted in numerous

10   felony arrests and the recovery of drugs and firearms.  *Motion (#18), Exhibit "B", page 2.*  The

11   application stated that the second confidential informant had provided information to the police in the

12   past.  Detective Denton testified that this second informant did not have prior felony or misdemeanor

13   convictions, but did have prior arrests for narcotics-related and soliciting offenses.  *Transcript, page 36.*

14   In his Supplemental Brief (#34), Defendant argues that the search warrant in this case was not supported

15   by probable cause and/or that based on the omission of the information regarding the confidential

16   informants' prior criminal history, Defendant may be entitled to a *Franks* evidentiary hearing.

17        In *United States v. Leon*, 468 U.S. 897, 922-23, 104 S.Ct. 3405, 3420 (1984), the Court held that

18   evidence will not be suppressed based on a search warrant that is arguably not supported by probable

19   cause if the officers executing the warrant had an objectively good faith basis in relying on the validity of

20   the warrant.   This good faith exception is, itself, subject to certain exceptions.  *Leon* states that

21   suppression of evidence remains an appropriate remedy if (1) the magistrate or judge issuing the warrant

22   was misled by information in the warrant that the affiant knew was false or would have known was false,

23   but for his reckless disregard of the truth; (2) the issuing magistrate or judge wholly abandoned his

24   judicial role in issuing the warrant such that no well trained officer could rely on its validity; (3) the

25   affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely

26

27        [3]The Court, therefore, may arguably decline to consider these issues since they were not raised
     in the motion to suppress.  *United States v. Bynum*, 362 F.3d 574 (9th Cir. 2004).

28

1   unreasonable; or (4) the warrant was so facially defective in failing to particularize the place to be

2   searched or the things to be seized that the executing officers could not reasonably presume it to be

3   valid.  *Id.,* 468 U.S. at 923; 104 S.Ct. at 3421.

4        Based on the information contained in the application in this case, there is no basis for finding

5   that the judge who issued the warrant wholly abandoned her judicial role or that the application for the

6   warrant was so lacking in indicia of probable cause, that the officers could not have relied upon it.  Nor

7   is Defendant entitled to suppression of the evidence on the grounds no reasonable officer would have

8   relied on the provision in the warrant that authorized the officers to search everyone found on the

9   premises.  As discussed above, the Court finds that Officer Warren was entitled to pat down the

10  Defendant based on reasonable suspicion.  Therefore, even if the general provision in the warrant

11  authorizing the search of all persons on premises is invalid, as it may well be, it does not require

12  suppression of the evidence because there were independent grounds, based on *Terry,* for the pat-down

13  search that resulted in the discovery of the firearm.

14       The only arguable basis for Defendant Newman to challenge the validity of the officers' reliance

15  on the warrant is that they intentionally or recklessly omitted information regarding the informants' prior

16  criminal histories and that probable cause would not have existed if this information had been included

17  in the application.  *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978).  A defendant is entitled

18  to an evidentiary hearing on the validity of the affidavit underlying a search warrant if the defendant can

19  make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false

20  statements or misleading omissions and (2) the affidavit cannot support a finding of probable cause

21  without the allegedly false information.  *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000);

22  *United States v. Stanert,* 762 F.2d 775, 780-81 (9th Cir. 1985), *amended by*, 769 F.2d 1410 (9th Cir.

23  1985).  In *Reeves*, the court noted that "we have recognized the importance of confidential informants to

24  the criminal justice system."  *Reeves,* 210 F.3d at 1044.  The court also stated that any past crime by the

25  informant involving dishonesty necessarily has an adverse effect on an informant's credibility.  In the

26  absence of countervailing evidence to bolster the informant's credibility or the reliability of the tip, an

27  informant's criminal past is fatal to the reliability of the informant's information, and his/her testimony

28  cannot support probable cause.  *Id.,* at 1045, citing *United States v. Meling*, 47 F.3d 1546, 1554-55 (9th

1    Cir. 1995).

2        *Reeves* also states, however, that if the informant has provided accurate information on past

3    occasions, he may be presumed trustworthy on subsequent occasions.  When the information provided in

4    the past involves the same type of criminal activity as the current information, the inference of

5    trustworthiness is even stronger.  *Id.,* at 1045.  *See also United States v. Elliot*, 322 F.3d 710, 716 (9th

6    Cir. 2003); *United States v. Patayan-Soriano*, 361 F.3d 494, 506-08 (9th Cir. 2003).  The informant in

7    *Reeves* had previously provided reliable information to the police which overcame any doubts regarding

8    credibility based on his undisclosed prior criminal history which included a conviction for providing

9    false information to the police about his address.  The court therefore held that if the information had

10   been included in the affidavit, it would not have affected the probable cause determination, and the

11   district court did not err in denying defendant's request for a *Franks* hearing.

12       In this case, the application stated that the first informant had done approximately three "C.I.

13   buys" for the police over the preceding eight months and had provided information that resulted in

14   numerous felony arrests and the recovery of drugs and firearms.  This information was sufficient to

15   overcome any doubts regarding the informant's credibility based on his prior criminal history which was

16   not disclosed in the application.  In addition, the informant attempted to make a controlled purchase of

17   narcotics from the residence while under police surveillance, thereby exposing himself to some risk,

18   which is some further indication of his credibility.  The application stated that the second informant had

19   provided information in the past, but did not indicate whether it was reliable or led to any arrests or

20   convictions of other narcotics suspects.  According to Detective Denton this informant did not have prior

21   felony or misdemeanor convictions, but did have prior arrests for narcotics and solicitation offenses.

22   While the information regarding the second informant's past cooperation is negligible regarding his or

23   her credibility, the informant also attempted to make a controlled purchase of narcotics at the residence.

24       In addition to the information provided by the informants, the officers also had information

25   obtained from Ms. Thomas that corroborated the informants' tips that Gandy was selling drugs from the

26   residence.  The application also stated in support of the request for nighttime service that during the

27   officers' surveillance of the premises they observed numerous persons and vehicles approach the target

28   residence and conduct what appeared to be narcotics transactions.  Officers also observed persons known

24

1  as lookouts walking up and down the street looking for undercover vehicles.  *Motion (#18), Exhibit "B"*.

2  Additionally, Mr. Gandy's prior criminal history involving attempted murder and felon in possession of

3  a firearm was additional information, beyond that provided by the two informants, indicating the

4  likelihood that he possessed weapons.  Therefore in viewing the totality of the circumstances and

5  information provided in the application, the Court finds that even if the informants' previous criminal

6  histories had been included in the application for the search warrant, there would still have been

7  probable cause to support the issuance of the warrant.  *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct.

8  2317, 76 L.Ed.2d 527 (1983).  The Court therefore finds that Defendant Newman is not entitled to a

9  *Franks* evidentiary hearing.[4]

10      **3.**    **December 8, 2005 Pat-Down Search**:

11      Sergeant Chavez testified that on December 8, 2005 at approximately 1:00 a.m. he saw

12  Defendant jump from or over a seven foot wall adjacent to an apartment complex and land in the yard of

13  a residence adjacent to an alley.  Sergeant Chavez testified that he also observed that Defendant was

14  carrying a plastic grocery type bag, although this information was not included in the dictated report that

15  another officer prepared based on information provided by Sergeant Chavez.  Upon making this

16  observation, Sergeant Chavez pulled his patrol vehicle into the alley, exited his vehicle and activated his

17  spotlight.  *Transcript, page 81.*  Sergeant Chavez testified that he asked Defendant to walk up to the

18  front of his patrol vehicle and to place his hands behind his back.  Sergeant Chavez testified that as the

19  Defendant placed his hands behind his back, he reached with his left hand and grabbed Defendant's

20  fingers preparatory to patting Defendant down for weapons.  *Transcript, pages 84-85.*  Defendant

21  initially resisted the officer's effort to physically detain him.  After Sergeant Chavez pulled his Tazer

22  gun, however, Defendant complied with the officer's instructions to lie against the patrol car.  The

23  officer handcuffed him and was able to complete a pat-down search for weapons which resulted in the

24  _____

25      [4]In Defendant's Addendum to Supplemental Brief (#37), Defendant also speculates that one of

26  the informants in this case may be the same informant involved in another case involving a prior search of 5087 Andover Drive.  In response, the Government states that neither of the informants in this case

27  were the same person as the informant in the other case alluded to by Defendant.  The Court finds that Defendant has failed to make a substantial showing that would justify the Court in conducting an

28  evidentiary hearing on this basis.

discovery of the handgun in Defendant's waistband.  The incident occurred in a high crime area which Sergeant Chavez testified was the focus of the Metro's "Crime Saturation Team."  Sergeant Chavez also testified that the alley was a major corridor of narcotics trafficking and an escape route for people fleeing from the police, and that his officers had previously encountered three or four people possessing narcotics and fleeing from police within area of this alley.

For purposes of the Fourth Amendment, a seizure occurs when a police officer by means of physical force or a show of authority in some way restrains the liberty of a person.  Whether a seizure has occurred is based on all of the circumstances in the encounter and whether police conduct would have indicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.  *United States v. Chan-Jimenez*, 125 F.3d 1324, 1226 (1997); *United States v. Hernandez*, 27 F.3d 1403, 1406 (9th Cir. 1994).  The evidence in this case supports the finding that Sergeant Chavez seized or detained Defendant.

Defendant argues that Sergeant Chavez did not have reasonable suspicion of criminal activity under *Terry* to detain Defendant and pat him down for the presence of a weapon.  Defendant compares the circumstances here to those in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637 (1979).  In *Brown*, two police officers were cruising in a patrol car in a high crime area at 12:45 in the afternoon.  The officers observed the defendant and another man walking away from each other in an alley. The officers pulled into the alley, and one of the officers got out and asked defendant to identify himself and explain what he was doing there.  The other man was not questioned or detained.  Defendant refused to identify himself and angrily asserted that the officers had no right to stop him.  The officer replied that defendant was in a high drug problem area and then frisked him, but found nothing.  Because defendant continued to refuse to identify himself, the officer arrested him based on a state statute that makes it a crime for a person to refuse to give his name and address to an officer who has lawfully stopped him and requested information.  Based on these facts, the Court held that the officer did not have a reasonable suspicion to stop defendant based on any objective facts that the defendant was involved in criminal activity.  The Court stated:

> Officer Venegas testified at appellant's trial that the situation in the alley "looked suspicious," but he was unable to point to any facts supporting that conclusion.  There is no indication in the record that it was unusual for

1
2
3
4

> people to be in the alley.  The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that the appellant himself was engaged in criminal conduct.  In short, appellant's activity was no different from the activity of other pedestrians in that neighborhood.  When pressed, Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity.

5   *Brown,* 443 U.S. at 52.

6       By contrast, the Government cites *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673 (2000), as

7   supporting the seizure and frisk of the Defendant.  In *Wardlow,* a caravan of four police cars were

8   proceeding into an area known for heavy narcotics trafficking in order to investigate drug transactions.

9   As the caravan proceeded, an officer in the last car noticed defendant standing next to a building holding

10  an opaque bag.  The defendant looked in the direction of the officers and then fled.  The officers chased

11  defendant down, cornered him and immediately conducted a protective pat-down search for weapons.

12  The officer felt a handgun in defendant's bag which he retrieved.  Defendant was subsequently convicted

13  for unlawful use of a weapon by a felon.

14      In holding that officers had reasonable suspicion that defendant was engaged in criminal activity,

15  the Court stated that while an individual's presence in an area of expected criminal activity, standing

16  alone, is not enough to support a reasonable, particularized suspicion that the person is committing a

17  crime, the characteristics of the location may be relevant in determining whether the circumstances are

18  sufficiently suspicious to warrant further investigation.  In holding that the officers had reasonable

19  suspicion to detain and frisk the defendant, the Court stated:

20
21
22
23
24
25

> Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.  In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists.  Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior (citation omitted).  We conclude that Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity and investigating further.

26  *Wardlow*, 528 U.S. at 124-25.

27      In so holding, the Court also noted that flight is not necessarily indicative of ongoing criminal

28  activity.  The fact that the conduct may in fact be innocent, however, does not establish a violation of the

1   Fourth Amendment.  The Court noted that the individuals' conduct in *Terry,* in pacing back and forth in

2   front of a store and peering into the window and periodically conferring, was ambiguous and susceptible

3   of innocent explanation.  The Court held, however, that the officer was justified in stopping the

4   individuals to investigate their suspicious behavior.

5          The fact that Defendant was in an alley in a residential area known for high crime activity at 1:00

6   a.m. does not itself constitute reasonable suspicion that he was engaged in criminal activity.  As

7   *Wardlow* and *Brown* indicate, these circumstances may, however, be relevant factors in determining

8   whether Defendant's other conduct in jumping over a wall from an adjacent apartment complex was

9   suspicious.  It is fair to say that the circumstances in this case lie somewhere between those in *Brown*

10  and *Wardlow.*  Defendant's conduct in jumping over a wall was not as suspicious of criminal activity as

11  an individual who immediately takes flight when he spots an approaching police car.  It is, however, not

12  as innocuous as that of pedestrians who are simply walking in an alley in broad daylight.  As Sergeant

13  Chavez testified:

14              Well, I wasn't sure what – what led him to jump over a wall 'cause, you
                know, it takes quite a bit of energy to get over a wall.  And at this hour – it

15              was 1:00 o'clock in the morning, holding a plastic bag, I wasn't sure
                whether he was just someone who wanted to take a shortcut or had this

16              person just committed a crime.

17  *Transcript*, page 84.

18         While Defendant's conduct may have been consistent with that of a person simply taking a

19  shortcut, the Court finds that a police officer who observes a person jump from a seven foot wall

20  separating an apartment complex from an alley in a high crime area at 1:00 a.m. in the morning has

21  reasonable cause to suspect that the person may be engaged in criminal activity.  Sergeant Chavez also

22  had reasonable suspicion to believe that Defendant might be armed to justify performing a pat-down

23  search for his own safety.  The stop occurred in a somewhat darkened alley.  Sergeant Chavez was by

24  himself and only he and Defendant were in the immediate vicinity of the alley.  Before Sergeant Chavez

25  could proceed with the pat down, Defendant resisted his efforts to place him in a position where he

26  could pat him down, which added to the suspicion the officer already developed that Defendant might be

27  armed.  The Court therefore concludes that Sergeant Chavez was justified in pulling his Tazer and

28  handcuffing Defendant so that he could detain him and pat him down.

**CONCLUSION**

Based on the foregoing, the Court concludes in regard to both the November 17, 2005 and December 8, 2005 incidents, that the officers had reasonable suspicion that Defendant was engaged in criminal activity and that he might be armed and dangerous.  The officers were therefore justified in detaining Defendant and performing pat-down searches for the presence of weapons, which in both incidents resulted in the discovery of firearms on Defendant's person.

**RECOMMENDATION**

**IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth Amendment Violation and Request for Evidentiary Hearing (#18) be **denied**.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley UNITED Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 13th day of July, 2007.

*George Foley Jr.*

GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE

29